## FARMERS' LOAN & TRUST COMPANY vs. THE COMMERCIAL BANK OF RACINE.

In construing a written instrument, the situation of the parties and the nature and object of their transactions may be looked at; but the court cannot give effect to any intention which is not expressed by the language of the instrument, when looked at in the light of such facts as are properly before it.

Where a railroad company mortgaged separately, at different times, the two divisions of which its road consisted, for the purpose of raising money to complete the road, and neither of the mortgages contained any language purporting to convey *materials* acquired *subsequently* to its execution, any further than they became a part of or appurtenant to the road, or were used in operating it: *Held*, that there was nothing in the general nature and object of the mortgages to give them a more enlarged meaning.

After the execution of said mortgages, and after the railroad company had acquired certain railroad chairs, which were in its possession but not put down, it executed another mortgage of its railroad and appurtenances, and all *materials*, &c., to another creditor—this mortgage declaring itself to be subject to the lien of the two mortgages first mentioned, and that *they* were "in all respects prior, superior and senior liens upon the property and premises described therein respectively, acquired and to be acquired." *Held*, that although the second mortgage conveyed the said chairs as *materials*, there was nothing in its language to estop the company from denying that they were conveyed by the first mortgages.

Whether a prior mortgagee could insist upon an estoppel growing out of a recital in a subsequent mortgage to other parties which had in no degree produced or affected his position, need not be here determined.

Where the plaintiff in replevin has obtained possession of the property under the statute, if the jury find the defendant entitled to its possession, he may waive a return of it and take judgment for its value alone.

Section 11, chapter 132, R. S., authorizes the jury to assess the value in all cases
where they find the defendant in replevin entitled to a return of the property,
whether he waives the return or not.

January Term,
1862.

———

FARMERS' LOAN
& TRUST CO.
v.
COMMERC'L B'K
OF RACINE.

APPEAL from the Circuit Court for *Racine* County.

The decision of this court upon a former trial of this cause may be found in 11 Wis. Rep., p. 207. The action was brought to recover the possession of certain "railroad chairs, made for the purpose of fastening down the iron rails of railroads," or their value, with damages, &c. After the property had been replevied by the plaintiff under the statute, the defendant filed an answer containing, first, a general denial, and second, an allegation of title and right of possession in itself; and prayed judgment for the value of the property.

From the evidence offered at the second trial, the following facts appeared: On the 1st of September, 1855, the Racine & Mississippi Railroad Company executed a mortgage to the *Farmers' Loan & Trust Company*, which recited that the former company was engaged in constructing a railroad from the city of Racine to the town of Beloit in this state, "and for that purpose needed and was desirous of raising the sum of $680,000," and to secure its bonds to be issued for that amount it granted property described as follows: "All their railroad with its superstructure, track and all other appurtenances, made or to be made in the state of Wisconsin, from its eastern termination in the city of Racine to its western termination in the town of Beloit, and all the right and title of the said parties of the first part to the land on which said railroad is and may be constructed, together with all rights of way now acquired and obtained, or hereafter to be acquired or obtained by the said parties of the first part, and including the depots, engine houses, shops and other constructions at the city of Racine aforesaid, and at said town of Beloit, and at all other places along the line of said railroad, and the lots, pieces or parcels of land on which the same are or may be erected, and all the pieces of land which shall be used for depot and station purposes, with the appurtenances, and all the embankments, bridges, viaducts, culverts, fences and structuary thereon, and all other appurte-

January Term,
1862.

FARMERS' LOAN
& TRUST CO.
v.
COMMERC'L B'K
OF RACINE.

nances belonging thereto, and all the franchises, privileges, and rights of the said parties of the first part of, in and to or concerning the same, and also all and singular their railroad furniture, including engines, tenders, cars of every description, tools, materials, machinery, and every other kind of personal property, which shall be used for operating said railroad ; but nothing herein contained shall be construed to prevent the parties of the first part from selling, hypothecating or otherwise disposing of any bonds or other securities received in payment of stock, or otherwise, or any bonds or other property of the company not necessary to be retained for the roadway, depot grounds and stations, nor required for the construction or convenient use of their road, nor from collecting moneys due the company on stock subscription or otherwise, provided they shall diligently proceed to collect and apply all such means to the construction and equipment of their said railroad, and provided also that no default shall have been made in the payment of the interest or principal of any of the above described bonds." The mortgage contains also, 1. A clause granting to the mortgagees, after sixty days from any default in the payment of the principal or interest of any of said bonds, a right, upon request of the holder of such bonds, to sell the mortgaged property, or to take possession of the same, and as the attorneys in fact or agents of the railroad company, "to have, use and employ the same, making from time to time all needful repairs, alterations and additions thereto, and after deducting the expenses of such use, repairs, alterations and additions, apply the proceeds thereof to the payment of the principal and interest of all the said bonds remaining unpaid," &c. 2. A covenant on the part of the railroad company "to execute and deliver any further reasonable and necessary conveyance for the said premises, or any part thereof, to the said parties of the second part, for more fully carrying into effect the objects hereof, particularly for the conveyance of any property subsequently to the day hereof acquired by the said parties of the first part, and comprehended in the description contained in the premises."

This mortgage was recorded in Racine county, September
18, 1855.

On the 2d of June, 1856, the railroad company executed a mortgage on the western division of its road in Illinois, to the *Farmers' Loan and Trust Company.* This mortgage recites that the company was engaged in constructing a railroad from the city of Racine to the town of Beloit in this state, and thence to the town of Savanna in Illinois, and for that purpose needed and was desirous of raising $700,000, and to secure the payment of that sum was about to issue bonds to that amount secured by said mortgage. This mortgage is otherwise precisely similar to that of September 1st, 1855, *mutatis mutandis.*

In June, 1857, the railroad company, to secure payments of its bonds to be issued to the amount of $700,000, executed to Morris K. Jesup and Curtis B. Raymond, a second mortgage, dated January 2, 1857, on the whole of its road, extending from Racine in this state to Savanna in Illinois. This mortgage is similar in its recitals, and in its description of the mortgaged property, to the one last mentioned, but adds, after the granting clause, the following: "subject however to the lien of two certain other indentures of mortgage executed by the said Racine and Mississippi Railroad Company, one dated September 1, 1855, upon the eastern division of the road * * ; and the other dated June 1, 1856, upon the western division of the road * * * ; the said two mortgages being, and [they] are hereby declared, in all respects prior, superior and senior liens upon the property and premises described therein respectively, acquired and to be acquired, without regard to the relative times of the issue or disposal of the bonds by the said Racine and Mississippi Railroad Company."

On the 3d of December, 1858, an action was commenced in the U. S. court for the district of Wisconsin, by the *Farmers' Loan & Trust Company,* to foreclose its mortgage of September 1, 1855. On the 10th of May, 1859, while this action was pending, the railroad company executed to the *Farmers' Loan & Trust Company* a deed of surrender, by which, with a view of avoiding litigation and enabling the

January Term,
1862.

FARMERS' LOAN
& TRUST CO.
v.
COMMERC'L B'K
OF RACINE.

holders of the mortgage bonds to provide for the further construction of the road, they yielded up to said company their road "from its eastern terminus at Racine, to its contemplated western terminus at Savanna," describing the property so surrendered in the same terms as are used in the mortgages above mentioned. See *Farmers' Loan & Trust Company vs. Cary*, 13 Wis., on pp. 115–117. On the 17th of the same month, by stipulation between the railroad company and the *Loan & Trust Company*, a judgment of strict foreclosure was rendered against the railroad company in said suit in the district court.

On the 27th of March, 1858, the directors of the railroad company passed a resolution authorizing the execution of a bond in the penal sum of $500,000, payable to H. S. Durand and others (most of whom were directors of the company), with condition that the company would save them and each of them harmless from all loss, expense and damage which they or any of them might sustain on account of any indorsement or liability which they or either of them had made or incurred on account of the company; and the execution of a chattel mortgage upon all personal property and rolling stock of the company, to secure the performance of the condition of the bond. The bond was executed in pursuance of the resolution, and on the 12th of April, 1858, the chattel mortgage was executed in the name of the railroad company, by H. S. Durand, its president, which purported to sell and transfer to the persons named in said resolution, all the personal property and rolling stock of the company (the chairs in controversy being mentioned in the schedule attached), upon condition that the sale should be void if the company should pay to the mortgagees the penalty of the above mentioned bond. The mortgage gave the mortgagees authority, upon default in the payment of said sum, to take the mortgaged property and sell it either at public or private sale, and out of the money to retain and pay the penalty of said bond and expenses of sale, &c. It also declared that until default should be made in the condition of said bond, the party of the first part should remain in possession as the

January Term, 1862.

FARMERS' LOAN & TRUST CO.
v,
COMMERC'L B'K OF RACINE.

agent of the mortgagees until they should choose to demand the same.

On the 21st of December, 1859, an action was commenced in the Walworth circuit court, by Jesup and Raymond, to foreclose their mortgage, and a judgment of foreclosure was rendered, directing a sale of that portion of the mortgaged premises situate in this state, to make the sum of $870,644, with costs &c. The several persons who held the chattel mortgage above referred to, were made defendants to this foreclosure suit; but the record does not show what allegations were made in the complaint respecting their rights. The order of sale described the mortgaged property situate in this state precisely as it was described in the Jesup & Raymond mortgage. At the sale under this judgment, the property was purchased by Morris K. Jesup for $210,000, " subject to the rights of the *Farmers' Loan & Trust Company*," under their mortgage of September 1, 1855; and the sale was confirmed January 2, 1861.

The chairs in controversy were purchased by the railroad company a short time before the mortgage to Jesup & Raymond was acknowledged and recorded. There was proof tending to show that the chattel mortgagees took possession of the chairs immediately after the execution of the mortgage, and in April, 1859, sold them to the defendant. The bill of sale of the chairs was executed by Durand, on behalf of the mortgagees; and he, acting as president of the company, indorsed on it the consent of the company to the sale. The price of the chairs was to be applied by the defendant on the indebtedness of the railroad company for which Durand was liable to it as indorser. There was some evidence tending to show that the other chattel mortgagees had given Durand authority to act for them in the sale of the property; that the sale of the chairs was reported by Durand to the board of directors and approved; and that it was agreed at the time of the sale, that the defendant was not to allow credit for them if the title should fail. There was no evidence that the chattel mortgagees had paid anything upon indorsements or liabilities made or incurred by them for the company, but

January Term,
1862.

FARMERS' LOAN
& TRUST CO.
v.
COMMERC'L B'K
OF RACINE.

some of the liabilities were past due, and suits were threaten-ed, and their pecuniary credit injured.

The plaintiff demanded the chairs before the commence ment of the action, and the defendant refused to deliver them. It was admitted that the value of the chairs was $5,100.

The plaintiff requested the court to give the following in structions to the jury: "That inasmuch as the mortgages to the plaintiff contain an implied contract, that the moneys raised on the mortgages should be applied to the construc-tion of the road, and there is no dispute but that the chairs were purchased and placed at the end of the road for that purpose; and inasmuch as said mortgages contained clauses that bonds and some other kinds of property might be sold under certain circumstances, thereby directly implying that all of the property of the company was included in the mort-gages; and inasmuch as said mortgages contained clauses that upon default of the company the mortgagees should take possession of the road and property of the company, as their agents, and should have power to extend the road; and inasmuch as none of said clauses are passed upon in the decision of the supreme court, and two of them were not contained in the case before the supreme court; and inas-much as there has been new evidence introduced, showing that the company were authorized to build the road in di-visions; and inasmuch as some of the chattel mortgagees themselves testified that this property was included in the mortgages to the *Trust Company*; and inasmuch as the sec-ond mortgage executed to Jesup & Raymond, shows that it was intended by the parties that this property should be in-cluded in the mortgages to the *Trust Company*; and inas-much as said second mortgage is of itself alone a muniment of title to the plaintiffs; and inasmuch as it is admitted that said second mortgage was executed and delivered after the purchase and delivery to the railroad company of the prop-erty in question; and inasmuch as the defendant claims by a ti-tle from said railroad company subsequent to the execution of said second mortgage; and inasmuch as said defendant is as much estopped by said second mortgage as the railroad

company or the mortgagees in said second mortgage; and inasmuch as the said second mortgage has been foreclosed in a suit wherein all the chattel mortgagees and said railroad company were defendants; and in pursuance of said fore- closure there has been a sale of all said property to M. K. Jesup, subject to the rights of said *Trust Company* as declared in said second mortgage, which sale has been confirmed; and inasmuch as the property in question had been bought by the company and delivered to it previous to the execution and delivery of the deed of surrender, and the surrender was made for the avowed purpose of completing the road, and, under the decision of the supreme court, the property may be included under the word " materials" used in said deed, as the materials were then on hand; therefore the plaintiffs are entitled to the possession of the property in question. 2d. That the defendant is estopped by the second mortgage from denying the plaintiff's title to the property. 3d. That the defendant not having claimed a return of the property in his answer, the jury cannot find a verdict for a return of the property. 4th. That one of the issues in this case being that the defendant is the owner of the property, the jury must pass upon this issue; and if they find that the defendant is not the owner, then no judgment can be rendered in favor of the defendant, either for a return of the property or for its value. 5th. That the foreclosure of the second mortgage cut off, barred, foreclosed and put an end to the title under which the defendant claims. 6th. That if the jury believed from the evidence that the property in dispute (the railroad chairs) was purchased and furnished on the line of the Racine and Miss. Railroad by the Racine and Mississippi R. R. Company for the further construction or repair of their road, then and in that case the property (the railroad chairs in question) was included in the railroad company's mortgage to the plaintiff, and passed, with the other property included in that mortgage, to the mortgagees, upon a foreclosure of said mortgage, or upon a surrender of the mortgaged property under the mortgage, and the jury should find for the plaintiff; and if this property had been so purchased and taken to the end of the road and

January Term,
1862.

FARMERS' LOAN
& TRUST CO.

v.

COMMERC'L B'K
OF RACINE.

there thrown in a heap, any subsequent change of purpose and removal of said property could not affect the plaintiff's rights; and the plaintiff could maintain this action to recover it; and it was not necessary that plaintiff's mortgage should have been filed as a chattel mortgage. 7th. If the jury believe from the evidence that the conditions of the bond which the chattel mortgage was given to secure have not been broken—that there was at the time of the sale to the defendant no default on the part of the chattel mortgagors—and that all the mortgagees have not joined in directing in relation to the taking possession of the property, the defendant is not entitled to a return of the property; and a breach in the condition of said bond could only happen when the mortgagees had been compelled to pay and had actually paid some of the debts of said company. 8th. If the jury believe from the evidence in this case, that the sale to the defendant was not absolute but merely conditional, to depend upon the happening of a contingency, such as if they could hold the property they would take it, paying nothing therefor, it is no sale, and the defendant obtains no right thereby to the property as against the creditor's subsequent purchasers or mortgagees. 9th. If the jury believe from the evidence, that the defendant has paid nothing for the property, and is only to pay for and take it as the property of the defendant upon the happening of something in future, such as gaining a suit, establishing a title, or any other thing that may or may not happen, then and in that case the defendant has no right to a return of the property. The chattel mortgage given in evidence by the defendant is void at law. It may possibly be good in equity, but it cannot avail as a defense to this action, for the reason that it provides for the payment of the penalty of the bond instead of its conditions."

These instructions the court refused to give; and the plaintiff excepted.

The court then instructed the jury as follows:—"If the jury are satisfied from the evidence, that at the time of the commencement of this suit the plaintiff was not the owner of the property, or entitled to the possession thereof, and that

the defendant was then in the possession of the property, the defendant is entitled to have the property returned to his possession, or in case possession cannot be returned to the defendant, he is entitled to the value of the same."

January Term, 1862.

Farmers' Loan & Trust Co.
v.
Commerc'l B'k of Racine.

The verdict was as follows : " We, the jury, do find for the defendant, that the defendant did not wrongfully detain the personal property described in the complaint in this action; and we do further find the said property in the defendant, and that the defendant is entitled to the possession of said property and a return thereof; and the same is of the value of five thousand one hundred dollars, and we assess the damages of detention at the sum of six hundred and twenty-nine dollars, being the interest on the value of said property from the taking thereof; and defendant having waived the return of the property, we assess the defendant's damages in all at the sum of five thousand seven hundred and twenty-nine dollars.

Judgment in favor of the plaintiff for the value of the property, and damages for its detention.

*Strong & Fuller*, for appellant :

1. The judgment is erroneous. A defendant who succeeds in an action to recover the possession of personal property, where the property has been delivered to the plaintiff, must, under our statutes, take judgment either for the costs only, or in the alternative for a return of the property or for the value thereof in case a return cannot be had. ˙ The decision in *Pratt vs. Donovan*, 10 Wis., 387, was founded entirely upon sec. 1, chap. 42, Laws of 1854; but this act was repealed January 1st, 1859, before the commencement of this suit. The unanimous decision of the court of appeals of New York, in *Dwight vs. Enos*, 5 Seld., 470, is entitled to careful consideration ; and the words " and the defendant claim a return thereof" do not give to our statute a different force from that of the New York statute. In the action of replevin both parties are actors. It is the only action in which the plaintiffs file pleas. It was the only action at common law, or by the practice in New York, in which the defendant could notice the case for trial. At common law, on a verdict upon a plea of *non cepit* alone, the defendant had judg-

January Term, 1862.

FARMERS' LOAN & TRUST CO.
v.
COMMERC'L B'K OF RACINE.

ment for costs only. Chitty's Pleadings, 449. If he had any further judgment, it was a judgment of *retorno habendo* (2 Tidd's Prac., 843 ); but to obtain this he was compelled to *claim a return* of the property by his plea, avowry or cognizance. See the form of the conclusion of avowries and cognizances, 3 Chitty's Pleadings, 1043, and the forms of pleas of property in the defendant or in a stranger, Id., 1044. The party in replevin who is defendant so far as his plea of the general issue or general denial is concerned, stands in the position of plaintiff so far as *his* avowries, cognizances and special pleas of property are concerned, and to these the nominal plaintiff files his plea and becomes really a defendant. All the issues must be passed upon by the jury, and unless the defendant recovers upon those in which he stands as plaintiff, he can have judgment neither for the return of the property nor for the value thereof. With this view of the case, the construction in *Dwight vs. Enos* seems consistent with the general principles of law, and is not subject to the objection that the words of the statute, " and the defendant claim a return thereof," have no effect. On the contrary, we find these words familiar to the common law, time out of mind, when the defendant could have no judgment for the value of the property. Without this claim, he could have no judgment except for costs. The defendant's option, then, was between a judgment for costs only and a judgment for the return of the property, and not between a judgment for the return and a judgment for the value of the property.

The course of legislation throws light upon this subject. The state of New York, as early as their Revised Statutes of 1820, made an innovation upon the common law principle, and gave the defendant the option of taking judgment either for the return or the value of the property. By the Code, the state of New York has returned to the common law doctrine. Wisconsin, in the statutes of 1839, followed the innovation of New York, but in 1849, to remedy the injustice which might be suffered under the New York doctrine, the legislature adopted new and peculiar provisions, allowing the defendant to recover, not the value of the property replevied, but the value of his interest in the property

only.   We are not aware that any similar provisions have
been adopted by any other state.   In 1859, Wisconsin again
returned to the common law doctrine, as did the state of
New York.   And we submit that in practice, the common
law doctrine, must be found to be far more just to all parties
concerned, than the innovations indulged in for awhile by
the states of New York and Wisconsin, and after trial aban-
doned by both states.·  Why compel one to purchase a large
amount of personal property, because he innocently thought
himself the owner of it, or even perhaps when he was the
real owner, but failed in his suit by some  defect in the pro-
ceedings, or by some failure to make  proof which actually
existed ?   Suppose it turns out upon the trial, that the prop-
erty belongs to some third party, if the defendant has his
election to take a judgment for the value of it, and does so,
the plaintiff is compelled to pay the defendant the full val-
ue of the property, and is  immediately subject  to another
suit, by the real owner, for the property or the value of it.
But if the judgment had been for the  return of the proper-
ty, no such dilemma would exist.   The real owner would
recover his property from the defendant.   The court in
*Dwight vs. Enos* say, that the Code places the plaintiff and
defendant, in this respect, upon an equality.   Is there any
reason apparent why the defendant  should have the advan-
tage over the plaintiff, which the former statute gave him ?
2.  The defendant, not having claimed a return of the
property in his answer, could not recover any judgment ex-
cept for costs.   This point was raised in *Dwight v. Enos*, but
not decided.   The jury cannot assess the value of the prop-
erty, unless the defendant, by his answer, claim a return
thereof.   R. S., chap. 132, sec. 11.   Nor can the court ren-
der a judgment for the return, unless this claim was made.
R. S., chap. 132, sec. 31.   The only form provided for the
execution (chap. 134, sec. 8) is upon a judgment where such
claim is made.   3. The defendant's possession of the proper-
ty at the time it was replevied, where that possession is pro-
ven to be illegal, is not enough to entitle him to a return of
the property.—There were two issues in this case ; one made
by the complaint and the general denial ; the other by the

January Term, 1862.

FARMERS' LOAN & TRUST CO.
v.
COMMERC'L B'K OF RACINE

defendant's plea of property and the plaintiff's denial, implied by the statute. In the former, the burthen of proof was upon the plaintiff; in the latter, upon the defendant. We admit that possession of property is *prima facie* evidence of ownership; but this presumption may always be rebutted by other proof. If there is always to be a return of the property when the defendant fails to make out his case, why need the defendant ever plead anything but a general denial? Why plead property in himself, or a third person? Why do the statutes and the common law require him to claim a return of the property? Why do the statutes require a jury to find that the defendant is entitled to a return of the property before a return thereof can be adjudged? And how could a jury so find, if the proof were clear that the defendant had neither the right of property nor that of possession? Counsel then contended that the evidence in this case proved that the defendant had no right to the possession of the chairs in controversy, at the commencement of the suit. 4. The defendant is estopped from denying the plaintiff's title to the property in question, by the clause in its mortgage to Jesup and Raymond which declares the mortgages to the *Loan & Trust Company* to be "in all respects prior, superior and senior liens upon the property," &c. To this point counsel cited 9 Paige, 145; 13 Mass., 518; 3 Edw. Ch., 132; 4 Sandf. Ch., 339; 9 Wend., 209; 4 Peters, 83; 6 id., 598, 611; Co. Litt., 352; 2 S. & R., 508; 5 Day, 88; 7 Conn., 214; 2 C. & H.'s Notes, 1236; id., note 481. 5. The property in question is included in the first mortgage on the western division of the road, and in the deed of surrender, and by virtue of these the plaintiff is entitled to the immediate possession of it. (1.) The second mortgage operates not only as an estoppel; it is an admission and a declaration of what the first mortgages included. (2.) The clause showing that the railroad company needed the amount named in the mortgage for the purpose of finishing their road, throws great light on the situation and intention of the parties. It is an implied contract that the money borrowed should be applied to the construction of the road—such a contract as could have been enforced by a bill for specific

performance. On such a clause alone the supreme court of the United States decided that subsequently acquired property was held by a railroad mortgage. *Pennock v. Coe*, 23 How. (U. S.), 117. The clause shows that it was the intention of both parties that the materials necessary for the construction of the road, including these chairs, should be procured; that they should become connected with the road, and at any rate be eventually subject to the mortgage; and no motive can be assigned why the railroad company should object to the property being subject to the mortgage, while it was of the first importance to the mortgagees that it should be so covered; for unless this property were obtained and applied to the railroad, their security would be entirely worthless. (3.) The clause authorizing the mortgagee, in case of default, to take the mortgaged property, and finish and extend the road and operate it as the agent of the mortgagor, is evidently for the purpose of carrying out the same intention. A similar clause was also dwelt upon by the court in *Pennock v. Coe, ubi supra*, as conclusive of the object of the parties. (4.) The covenant for further assurance, and "particularly for the conveyance of any property acquired subsequently to the date" of the mortgage, seems quite conclusive upon this point. (5.) So also is the clause which provides that nothing contained in the mortgage shall be construed to prevent the railroad company from selling their bonds or other securities, or lands or *other property* not required for the *construction* or convenient use of the road, &c. The *instrument* before the court therefore shows an intent to convey these chairs; and if there are any words or phrases in the mortgage which, in any of their various meanings, primary or secondary, legal, technical or popular, comprehensive or restricted, would cover this property, the court will adopt that meaning and carry out the intention of the parties. This principle is illustrated in various cases in regard to the word "appurtenances," making it extend beyond its technical sense, where it was the intention of the parties to do so. 2 Saund. R., 401, note 2; 3 Wils., 141; 2 W. Black. R., 726, 1148; 2 Term R., 498; 1 Bos. & Pull., 53. See also 5 Barn. & Cress., 149. Counsel contended that the words

January Term, 1862.

FARMERS' LOAN & TRUST CO.

v.

COMMERC'L B'K OF RACINE.

"railroad", "franchises" and "appurtenances" were intended to be used in a sense sufficiently broad to cover the property in dispute.

*Cary & Pratt,* for respondent.

May 15.

*By the Court,* PAINE, J.   In this case the appellant claims a quantity of railroad chairs, under railroad mortgages executed by the Racine & Mississippi Railroad Company.   The case has once been before this court, and as it appeared that the chairs in question were acquired by the railroad company after the execution of the mortgages, we held that the plaintiff had no title, for the reason that the mortgages contained no language purporting to grant materials which the company might thereafter acquire to use in constructing the road,   except so far as such materials were actually so used and became a part of the road itself.   Some additional evidence was introduced at the second trial, which, the counsel for the appellant claims, furnishes new light upon this question, and shows that the intention of the parties was to grant everything that the company then owned or might afterwards acquire.   And he claimed that the intention of the parties should be arrived at, as well by the consideration of their situation and the general nature and object of railroad mortgages, as of the words in the instruments.   There is no doubt that the intention is the object to be sought for in construction.   And to get at that, the situation of the parties, and the nature and object of their transactions, may be looked at.   But it must be borne in mind that it is not the business of construction to look outside of the instrument to get at the intention of the parties, and then carry out that intention whether the instrument contains language sufficient to express it or not; but the sole duty of construction is, to find out what was meant by the language of the instrument.   And this language must be sufficient, when looked at in the light of such facts as the court is entitled to consider, to sustain whatever effect is given to the instrument. And we can see nothing in the additional evidence now before us, which we think ought to change the effect before given to the mortgages under which the appellant claims.

The counsel was obliged to concede that the language, accu- rately construed, did not profess to grant materials to be thereafter acquired, any further than they became a part of the road granted, or appurtenant to it, or should be used in operating it. This I think cannot be denied; and so far as the meaning of the language is concerned, I can perhaps add nothing to what I said in the former opinion upon that subject.

Should the general nature and object of the conveyances give to that language any more enlarged meaning? I am unable to see why it should. The company first mortgaged the eastern division of its road. Notwithstanding this, it still remained necessary for it to have materials for the western division. It was therefore utterly improbable that it intended, in the first, to grant all materials that should be thereafter acquired, and was very natural for it to limit the grant to such materials as should actually become a part of the road granted, or be used in operating it. This being true of the first mortgage, is equally true of the second. For although the first division was mortgaged, it was still in possession of the company, and they might still need materials for its completion. How can it be said, therefore, that they intended in the second to convey all materials thereafter to be acquired, though such materials might be needed for the first division? It is true here that both divisions were mortgaged to the same corporation, but I cannot see that this fact should have any influence in their construction. If they had been conveyed to different mortgagees I should find it impossible to say which lien, if either, attached to these materials as soon as they were acquired by the company. It seems equally impossible although both mortgages are to one trustee. The company evidently did not intend to annihilate itself, or its capacity to acquire and hold property, and I can see nothing in the nature and objects of the conveyances that should warrant the court in assuming an intention to include in them that to which their language does not extend.

The counsel for the appellant also relied on an estoppel, which he claimed to grow out of the following facts: After

January Term,
1862.

FARMERS' LOAN
& TRUST CO.
v.
COMMERC'L B'K
OF RACINE.

the execution of the mortgages under which the appellant claims, and also after the company had acquired the chairs in question, it executed another mortgage to Jesup & Raymond, which was expressly declared to be subject to the two prior mortgages to the appellant. As the railroad company had these chairs when this last mortgage was made, so that they were conveyed by that as "materials," and as that was made subject to the two prior mortgages to the appellant, it is said that the company and all claiming under it are estopped from showing that the two prior mortgages did not include all that was conveyed by the Jesup & Raymond mortgage. Without stopping to inquire whether a prior mortgagee would be in a position to insist upon an estoppel growing out of a recital in a subsequent mortgage to other parties, which had in no degree produced or affected his position, we are clearly of the opinion that there is no estoppel in this case, from the language of the subsequent mortgage itself. It does not say that the mortgages to the Trust Company are prior liens upon all the property "herein described," but after referring to each of them specifically, says they are prior liens upon all the property "therein described respectively" &c. This recital, therefore, does not profess to give those mortgages any more extensive application than they respectively purport to have, and can create no estoppel. If one having ten lots, mortgages nine of them, and afterwards gives a mortgage upon all, subject to the prior mortgage upon the lots "therein described," this certainly could not extend the prior mortgage to the tenth lot, nor estop the mortgagor, or any one claiming under him, from showing that the tenth lot was not included in the first mortgage.

The only remaining question necessary to be considered, is as to the form of the judgment taken by the defendant. The judgment was for the value, and not in the alternative, for a return or the value in case a return could not be had. This question was passed upon by this court in the case of *Pratt v. Donovan,* 10 Wis., 387, in which it was held that a defendant might, under the Code and act of 1854, which was then in force, waive a return and take a judgment for the

value. Since then, the act of 1854, referred to in that case, has been repealed in the general revision, leaving the question to depend on the provisions of the Code in relation to judgments, which were also therein referred to. It is now insisted that the decision in *Pratt v. Donovan* depended on that act, and that the same conclusion cannot now be sustained. But we are of the opinion that the provisions of the Code in relation to judgments, upon the construction of which the decision in *Pratt v. Donovan* mainly depended, sufficiently recognize the option of defendants in these actions to waive a return and take judgment for the value, where the property has been delivered to the plaintiffs. And that decision sufficiently states the reasons for this conclusion.

The statute makes the alternative judgment in favor of a defendant dependent on the condition that he "claims a return;" and we can give no effect to this clause except by allowing an option to claim a return or not. Counsel construe it as a description merely of that class of defenses which, if established, would entitle the defendant to a return, as distinguished from those which would not. But it does not seem to us such as would have been used for that purpose. If that had been the design, the legislature would have said that where the defendant succeeded on an answer which would entitle him to a return, the judgment should be in the alternative. The language used seems much more aptly to describe the option which defendants had in such cases, by the law in force at the time the Code was adopted, to waive a return and take judgment for the value, than it does the difference between pleas which entitle him to a return and those which do not. And we think there is reason and justice in preserving this option to defendants. The plaintiff has in effect the same option; for although he may not elect, after having brought his suit to obtain the property, to take a judgment for the value where a return can be had, he might have waived a return before bringing suit, and have sued for the value either in trespass or trover. And where the plaintiff has unjustly taken the defendant's property into his own possession, even though by the aid of a legal pro-

January Term,
   1862.

Farmers' Loan
 & Trust Co.
    v.
Commerc'l B'k
of Racine.

cess, there is no reason why the defendant, if he chooses, should not have the right to compel him to abide by the consequences of his own acts and to pay for the property. Indeed it might, in many instances, be oppressive to defendants to compel them to receive it back. Thus suppose a contractor has procured certain articles with which to complete his contract, and some plaintiff replevies them and gives the bond necessary to take possession. The litigation may last for years, but the contractor is bound to complete his contract immediately. He provides new articles for that purpose, and afterwards succeeds in the suit. Should he be bound then to take back the articles when he had no longer any use for them? It seems to me not.

And the fact that plaintiffs might sometimes be compelled to pay for property, and lose it afterwards, is no reason why the defendant should not be entitled to a judgment for the value. If the defendant in replevin had been sued in trespass, he might have been made to pay for the property, and yet some stranger might afterwards have taken it from him on proving a better title than the plaintiff in the trespass suit. This is a risk that all parties have to run. But it affords no reason why the judgment should not be according to the rights of the parties as they are made to appear in the suit. Possession was sufficient evidence of title in the defendant until the plaintiff showed a better title. And if that possession would be sufficient to justify a judgment for a return of the property, it is equally sufficient to justify one for its value, and the defendant's option to take such an one ought not to be defeated for the purpose of allowing plaintiffs to resort to legal process to get possession of their neighbors' property with the least possible risk to themselves.

It is true, the statute does not provide what the judgment shall be where the defendant does not claim a return. But as it was well understood that in all cases where a defendant was entitled to a return, the judgment was either for a return or the value, it was left as a necessary implication that where he waived a return the judgment could be only for the value. The statute does not say what the judgment shall be in cases where the defendant succeeds on a plea that does not

entitle him to a return, as where he simply denies the taking. <span style="float:right">January Term</span>
Yet as the only judgment to which he was ever entitled in <span style="float:right">1862.</span>
such a case was a judgment for costs, the statute seems also <span style="float:right">Rose et al.</span>
<span style="float:right">v.</span>
to have left that to implication. <span style="float:right">Tolly.</span>

We think also that section 11, chap. 132, authorizes the jury to assess the value in all cases where they find that the defendant is entitled to a return, whether he waives the return or not.

The judgment is affirmed, with costs.